FREEMAN v. MOFFITT *et al.*, *Appellants*.

Division Two, June 30, 1896.

1. **Practice**: SPECIAL FINDING OF FACTS: APPEAL.  The finding of facts by the court, in ejectment, has the effect of a special verdict and if supported by substantial evidence will not be disturbed on appeal.

2. **Land Title**: MORTGAGE: FORECLOSURE SALE: INNOCENT PURCHASER. Where through the negligence of one holding a mortgage on land, the records show a good chain of title, a purchaser at the foreclosure sale relying on such records will acquire a good title as against such mortgage.

*Appeal from Polk Circuit Court.*—HON. ARGUS
COX, Judge.

AFFIRMED.

*C. W. Hamlin* for appellants.

(1)   W. B. Freeman was not a purchaser in good
faith.   The law requires men in such matters to use
reasonable prudence and intelligence to acquaint them-
selves with the condition of their title to property, and
if they fail to do so, they can not be innocent pur-
ch'asers.  *Freeman v. Moffitt,* 119 Mo. 280; *Tydings v.
Pitcher,* 82 Mo. 379; *Bank v. Delano,* 48 N. Y. 336;
*Patterson v. Booth,* 103 Mo. 414; *Fitzhugh v. Barnard,*
12 Mich. 104.   (2) There was enough appearing on
the records and lying within plaintiff's chain of title to
put a reasonably cautious and prudent person upon
inquiry and give him notice of the defendant's claim
of title.   (3) The notice did recite appointment of
trustee by separate instrument, as provided in second
deed of trust.   Plaintiff is charged with constructive
notice of the recitals in all recorded instruments which
constitute the chain of title under which he claims,
and if by the examination of the records plaintiff could
have ascertained the condition of his title, and failed
to examine, or made no attempt to examine the
records, he can not be held to be an innocent pur-
chaser.  *Freeman v. Moffitt,* 119 Mo. 280; *Tydings v.
Pitcher,* 82 Mo. 379; *Fleckenstein v. Baxter,* 114 Mo.
493; *Acor v. Westcott,* 46 N. Y. 384; *Nute v. Nute,* 41
N. H. 60; *Hamilton v. Nutt,* 34 Conn. 510.   (4) The
fact that the consideration paid by Smith and Mc-
Quarry was so grossly inadequate and in fact the
recitals in McQuarry's deed to W. B. Freeman, to
warrant and defend the title against all persons claim-

ing under, by, or through him, but not against any other person whomsoever, were sufficient within themselves to put a reasonably cautious person upon inquiry if acting in good faith. *Roan v. Winn*, 93 Mo. 511; *Briggs v. Rice*, 130 Mass. 50; *Singer v. Jacobs*, 3 McCrary (U. S.), 638; *Benne v. Schnecko*, 100 Mo. 256; *Ins. Co. v. Smith*, 117 Mo. 293. (5) W. B. Freeman took by a special warranty deed, and all others had been quitclaim or trustee's deeds, and the registry act does not aid plaintiff in this case. A quitclaim deed is notice of all prior equities. *Bogy v. Shoab*, 13 Mo. 380; *Ridgeway v. Halliday*, 59 Mo. 444; *Mann v. Best*, 62 Mo. 491; *Wolf v. Dyer*, 95 Mo. 545; *Freeman v. Moffitt, supra.*

*Upton & Skinker* for respondent.

(1) The finding of facts by the trial court stands as a special verdict, and if there is any evidence to support the finding, this court will not weigh the evidence. *Freeman v. Moffitt*, 119 Mo. 280, and cases therein cited. (2) Appellants have wholly failed to file a full, fair, and complete, printed abstract of the record as required by rule 13 of this court, and their appeal should be dismissed. *Long v. Long*, 96 Mo. 180; *Craig v. Scudder*, 98 Mo. 664; *Snyder v. Free*, 102 Mo. 325. (3) A party is not bound to search the records to see if any one under whom he claims has made a deed subsequent to the deed under which he claims. *Tydings v. Pitcher*, 82 Mo. 379; *Meier v. Meier*, 105 Mo. 411; 2 Jones, Mortg., sec. 1624; 3 Wash. Real Property, p. 292; Tiedeman on Real Property, sec. 817. Hence the record of the trustee's deed to Wilkinson and the lease from Wilkinson to Moffitt did not give constructive notice to plaintiff. (4) The deed from McQuarry to Freeman is a "war-

ranty deed." It contains the statutory words, "grant, bargain and sell," which, in themselves, contain covenants of warranty, seizin, and further assurance. If the clause at the close of the deed has any effect at all it limits the covenant of warranty only, and the covenants of seizin and further assurance are in nowise affected thereby. R. S. 1889, sec. 2402. (5) When W. B. Freeman went with McQuarry to look at the land with a view of trading for it, the defendant Moffitt led him to believe that he was in possession as McQuarry's tenant, and wanted to rent the land from Freeman for the ensuing year provided Freeman got it of McQuarry. Moffitt failed to inform Freeman of any claim of Wilkinson, but did claim to be holding under McQuarry. After inducing Freeman to believe that he was holding under McQuarry, it would indeed be "unconscionable" to now allow Moffitt to claim that he was holding adverse to McQuarry. *Freeman v. Moffitt*, 119 Mo. 280, last two paragraphs of opinion.

GANTT, P. J.—This is an action of ejectment for a farm in Polk county. This is the second appeal. The first is reported in *Freeman v. Moffitt*, 119 Mo. 280. The plaintiff recovered judgment again on the last trial, and defendants appealed.

The cause presents some features of the case quite differently from the case as made before. The petition is in statutory form, and the answers general denials.

Reuben Lunsford is the common source of title.

On September 1, 1886, Lunsford executed to the Equitable Mortgage Company his note for $1,200, due five years after date, with interest coupons, one of which fell due each six months throughout the term of five years. To secure this note and interest, Lunsford and wife executed their deed of trust, whereby they conveyed to Henry J. Page, as trustee, the lands in con-

troversy. This deed of trust was duly recorded *in book number 16, at page 119*, and contained the following recitals, among others:

"Whereas, the said party of the first part is justly indebted unto the said party of the third part in the sum of twelve hundred dollars, according to the tenor and effect of one certain promissory note of even date herewith duly executed by the said party of the first part, and payable on the first day of September, 1891, to the order of the Equitable Mortgage Company, at its office in Kansas City, Missouri, with interest thereon from the date thereof at the rate of seven per cent per annum, payable semiannually on the first days of March and September in each year, according, *to the coupons or interest notes thereto attached.*

"But if default be made in the payment of said note, or any part thereof, or any of the interest thereon when due, * . * * then the whole amount of said note, with interest thereon, shall at the option of the holder of said note, become immediately due and payable, without notice to said first party, and this deed shall remain in force, and the said party of the second part, or in case of his death, inability, or refusal to act, then the (then) sheriff·of said county of Polk (who shall thereupon become his successor to the title to said property) * * * may at the request of the holder of said note, proceed to sell," etc.

In April, 1889, the Equitable Mortgage Company prepared and sent to Samuel Hadlock, sheriff of Polk county, three documents, of the tenor following:

*First*, a written refusal of Page to act as trustee, and a request by the mortgage company, as holder of the note, for the sheriff to act as trustee. The substance of this document is as follows:

"Whereas, Reuben Lunsford and ———, his wife, by their deed of trust, dated the first day of Septem-

ber, 1886, and recorded in the recorder's office in and for Polk county, Missouri, in book 16, at page 119, conveyed to Henry J. Page, trustee, the property in said deed described, in trust to secure to the Equitable Mortgage Company, of Kansas City, Missouri, the payment of a certain note therein described. The said property being" (the land in controversy). "And whereas, said note has become due, and said Henry J. Page, trustee, has refused to act as such trustee, and does, by joining in the execution of this instrument, hereby refuse to act as such trustee, and assents to the appointment herein made. Now, therefore, the said Equitable Mortgage Company does hereby appoint Samuel Hadlock to act as trustee instead of the said Henry J. Page."

*Second*, the following notice of sale:

"Whereas, Reuben Lunsford and Betsy B. Lunsford, his wife, by their certain deed of trust dated September, 1886, and recorded in recorder's office of the recorder of deeds of Polk county, Missouri, *in book 16, at page 119*, conveyed to Henry J. Page, trustee, the following described real estate, situated and lying in Polk county (here follows a description of the land in suit), in trust to secure the payment of one certain promissory note therein described, together with the interest thereon, as provided in said note and deed of trust.

"And whereas, said Reuben Lunsford and Betsy B. Lunsford have made default in the payment of the fourth and fifth installment provided for in said note.

"And whereas, by reason of said default, under the terms and provisions of said note and deed of trust, the principal sum of said note has become due and payable.

"And whereas, it is provided in said deed of trust, that if the said Henry J. Page, trustee, shall refuse to

act, the legal holder of said note may appoint and substitute any other person as trustee, to act instead of the said Henry J. Page, who shall thereupon become his successor to the title of said property and the same become vested in him in trust for the purposes and objects of said deed of trust, with all the powers, duties, and obligations thereof.

"And whereas, the said Henry J. Page has refused to act in this behalf.

"And whereas, the Equitable Mortgage Company, the legal holder of said note, by its certain deed of appointment, dated April 10, 1889, recorded in the office of recorder of deeds of Polk county, state of Missouri, in book 28, at page 378, appointed and substituted the undersigned as trustee, to act instead of said Henry J. Page.

"Now, therefore, at the request of the legal holder of said note, and by virtue of the powers vested in me by said deed of trust and said deed of appointment, and for the purposes of foreclosing the same, I, the undersigned Samuel Hadlock, as trustee, do hereby give notice that I will, on Saturday, June 8, 1889, between the hours of 9 o'clock A. M. and 5 o'clock P. M. of said day, proceed to sell the property hereinbefore described at public vendue to the highest bidder for cash, at the front door of the courthouse in the county of Polk, state of Missouri, to satisfy said debt and interest, and the cost of executing this trust.

"SHERIFF OF POLK COUNTY."

*Third.* A deed to be executed to the purchaser at such sale, leaving blanks only for the amount of purchase money and name of purchaser which said blanks were afterward filled in with the name of "W. H. Smith," as purchaser, and "One hundred and fifteen and 10–100 dollars" as the amount of his bid.

The deed is in these words:

"Whereas, Reuben Lunsford and Betsy B. Lunsford, his wife, by their deed of trust dated the first day of Sept., A. D. 1886, and recorded in the recorder's office in Polk county, Missouri, in book 16, page 119, conveyed to Henry J. Page, as trustee, the property hereinafter described, in trust, to secure to the Equitable Mortgage Company the payment of the promissory note in said deed described.

"And, whereas, it is provided in and by the terms of said deed of trust, that in a certain contingency therein stated, the acting sheriff of Polk county, Missouri, in case of the absence, death, refusal to act, or disability in any wise of the above mentioned, Henry J. Page, trustee, may act in lieu of and perform the duties and powers delegated to the said trustee in and by the terms of said deed.

"And, whereas, Henry J. Page, the said trustee, has refused to act and by virtue of a deed of appointment dated April 10, 1889, recorded in the records of Polk county, Missouri, in record 28, at page 378, substituting and appointing the undersigned as trustee.

"And, whereas, default was made in the payment of the promissory note secured by said deed, by reason whereof, I, Samuel Hadlock, sheriff of Polk county, in the state of Missouri, acting as trustee, and in the place and stead of the trustee appointed in and by said deed, in accordance with the terms of said deed, did, at the request of the legal holder of said promissory note proceed to execute the powers to me given by said deed, and did, on Saturday, the eighth day of June, A. D. one thousand, eight hundred and eighty-nine, having previously given thirty———notice of the time, terms and place of sale, and of the property to be sold, by advertisement printed in the *Bolivar Free Press*, a newspaper printed and published in the city of Bolivar,

county of Polk and state of Missouri, a copy of which advertisement, with the affidavit of the printer of said newspaper, proving its publication, is hereto annexed and made part hereof, at the courthouse door in the city of Bolivar, Polk county, Missouri, aforesaid, expose to sale for cash, to the highest bidder, at public auction, the said property and real estate hereinafter described, and at said sale Wm. H. Smith being the highest and best bidder for the

"Southeast quarter of southeast quarter of section 26; the north half of northeast quarter, the northeast quarter of northwest quarter and north. ten acres of southwest quarter of northeast quarter of section 35, all in township 34, north, range 22 west, for the sum of one hundred and fifteen and 10–100 dollars, the same was struck off and sold to him at that price and sum.

"Now, therefore, know all men by these presents, that I, Samuel Hadlock, sheriff of Polk county, Missouri, as trustee as aforesaid, in consideration of the premises and of the sum of one hundred and fifteen and 10–100 dollars to me paid by the said Wm. H. Smith, of the county of Polk and state of Missouri, do bargain, sell, and convey unto him, the said Wm. H. Smith, the real estate in said deed described as follows, to wit:

"The southeast quarter of the southeast quarter of section number (26) twenty-six; the north half of the northeast quarter; the northeast quarter of the northeast quarter and the north ten acres of the southwest quarter of the northeast quarter of section number (35) thirty-five, all in township (34) thirty-four, north of range (22) twenty-two, west of the fifth principal meridian.

"To have and to hold the same unto the said Wm. H. Smith, his heirs and assigns, forever.

"In witness whereof, I, the said Samuel Hadlock, sheriff of Polk county, Missouri, as trustee aforesaid, have hereunto set my hand and seal on this 8th day of June, A. D. 1889.

"SAMUEL HADLOCK,  [SEAL]
"Sheriff of Polk County, Mo."

Acting under these requests and instructions the sheriff advertised the land to sell on June 8, 1889. At that sale W. H. Smith became the purchaser and received the above deed, which was duly recorded. Smith leased the land by written lease to appellant Moffitt for a term ending March 1, 1891.

Plaintiff showed a complete chain of record title from Lunsford, through Smith to himself, proved damages, rents, and profits, and rested.

Appellants contended and offered evidence tending to prove that the mortgage company *did not intend* to foreclose the deed of trust recorded *in book 16, page 119*, but intended to foreclose another deed of trust executed by Lunsford and wife the same day to secure ten install-ment notes for $12 each, known as the commission notes, and recorded *in book 16, page 122*.

The second deed of trust was introduced only for a special purpose, and appellants have not preserved it in their bill of exceptions, therefore neither it nor its recitals can be considered by this court. The only reference to this second deed of trust is found at the top of page 82 of the transcript, and is as follows: "*By Mr. Hamlin*—For the purpose of showing that there was a second mortgage on the land given by Reuben Lunsford and wife to the same parties, Henry J. Page, trustee, and the Equitable Mortgage Company, beneficiary, I want to introduce the deed of trust dated September 1, 1886, *recorded in book 16, page 122*."

Defendant offered oral testimony tending to prove that prior to the sale of the lands by Hadlock to Smith,

Hadlock received a letter from the attorney of the mortgage company "stating that he had made a mistake in giving book and page of the second mortgage for it was under that mortgage he desired Hadlock to sell." He instructed the sheriff to announce on the day of sale that he was selling under the second mortgage and not under the *first*, or the one described in the notice of sale but *subject* to the first mortgage.

Hadlock testifies he did on the day of sale publicly announce he was selling under the second mortgage. One Shriner bid at that sale for the land and it was knocked down to him and by his direction the deed was made to Smith. He testifies further that prior to this sale Lunsford had sold his equity of redemption to J. N. Sperry & Company and they had assumed the mortgage. They promised to pay the interest and stop the sale but neglected to do so and he sold. Shellenberger, who was clerking for the sheriff, corroborates his evidence.

J. N. Sperry details the subsequent manipulations of the title to this land as follows:

"My name is J. N. Sperry. I reside in Bolivar, Polk county, Missouri. I was a member of the firm of J. N. Sperry & Company during the year 1889. Our firm at that time consisted of W. R. Spoon, A. F. Shriner, W. H. Smith, and myself. I was acquainted with Reuben Lunsford. I negotiated the loan for which the Equitable Mortgage Company held the two deeds of trust introduced in evidence in this case. I was at that time acting correspondent or agent for said company. I have some recollection of promising Mr. Hadlock and Mr. Shellenberger to try to get up the money and pay off this second mortgage. I think that my firm had traded for the equity in the land in controversy from Mr. Lunsford prior to this time. It is my recollection the deed was not made directly from

Lunsford to any member of our firm, but it is my impression that we made a kind of three-cornered trade and had the equity traded off to a man in Kansas by the name of Ray and that we had Mr. Lunsford make the deed direct to Ray.   After Mr. Smith bought the land at trustee's sale my recollection is that he made a deed to Jerry Wolf.   Don't know that there was any consideration paid by Wolf.   We usually paid Wolf from three to five dollars to take deed from us and execute a deed of trust back to us to secure the notes named in the deed of trust.   I was president of the Bolivar Loan & Trust Company; Spoon, Smith and Shriner and myself were the shareholders in the company.   It was the understanding if we could sell the bonds executed by Jerry Wolf which were secured by deed of trust on the land in controversy our company was to divide the profits.   I remember when the land was sold under the Jerry Wolf deed of trust, that Mr. McQuarry bought it in.   At the time the land was sold to Smith by Hadlock as trustee at the sale and deed made to Smith we may have had an understanding with Reuben Lunsford that we would make the land bring the whole debt against the land.   I do not recollect that we had any correspondence with the Equitable Mortgage Company about this.''

Cross-examined.

''On the eighth of June, 1889, W. H. Smith was a member of our firm, he sold out to Schofield or Bennington about January 1, 1890.   I am positive that he was a member of our firm on the eighth day of June, 1889, and afterward.   Our office was burned in December, 1890.   At the time the loan was made to Reuben Lunsford our firm was agent of the Equitable Mortgage Company.   At the time of the foreclosure sale by Hadlock as trustee, we were not agents of the Equitable Mortgage Company.   If any of our friends

desired to send money to that company we would take
the money and forward the same to the company as a
matter of accommodation. There never was any inter-
est paid on the Jerry Wolf loan. The land was after-
ward sold to satisfy that deed of trust and J. H.
McQuarry was the purchaser.''

The defendant's counsel has wholly omitted the
testimony of Mr. Lunsford in the abstract. Wolf fully
corroborated Sperry as to their dealings. He gave
nothing for the land.

In the abstract offered in evidence by plaintiff the
deed from Reuben Lunsford to Ray appears to have
been recorded March 19, 1889, book 30, page 430, and
in defendant's evidence it is recited this deed was made
January 15, 1889.

Defendant also called the plaintiff as a witness.
He testifies he is a locomotive engineer. That he
inherited $550 from his grandfather's estate on his
mother's side and gave it to his father; that at various
other times he gave his father who was in straightened
circumstances moneys aggregating with the $550 about
$1,500. That the consideration $3,500 in his father's
deed to him was not the true consideration but the
$1,500 he had given his father was the real considera-
tion. He testified he never saw the land until several
months after his purchase and that defendant Moffitt
was then in possession and notified him that the mort-
gage company owned the land.

Plaintiff called W. B. Freeman, plaintiff's father,
as a witness. He testified that he came to Polk county
in the fall of 1890 and met McQuarry that time in
Bolivar. That he was then the owner of some livery
stock in Huntsville and in a correspondence with
Smith heard of this farm. He and McQuarry met and
McQuarry got a team and took him out to this farm.
He looked over it. Moffitt was on the farm.

McQuarry told Moffitt he had brought Freeman out to trade for the farm and if the trade was made likely Moffitt could remain on the place and Moffitt said if Freeman traded for it he wanted to keep the place. He testifies that Moffitt made no claim that he was holding under Wilkinson. He testifies that McQuarry then went to Huntsville with him to look at the livery stock. His stock had a $500 mortgage on it but was worth $2,000. McQuarry brought an abstract of title and a deed that had been executed by himself and wife at Bolivar. He took the abstract to his lawyer, Capt. Reed, in Huntsville who pronounced the title perfect. That thereupon he traded without any knowledge of any subsequent foreclosure and purchase by Wilkinson.

Upon a request of defendants for findings of fact, the court made the following findings of facts:

"L. E. Freeman, Plaintiff,⎫
    "v.                        ⎬ Ejectment, finding of
"Theo. Moffitt and Chas. ⎪ facts by the court.
Benj. Wilkinson, Defendants.⎭

"Under the evidence, pleadings, and admissions, the court finds the facts as follows:

"1st. Reuben Lunsford is the common source of title.

"2d. That on the day ———, 1886, said Lunsford borrowed of the Equitable Mortgage Company $1,200, for which he executed his bond payable in five years with interest coupons payable every six months, and secured the same by the deed of trust recorded in book 16, at page 119. That on the same day the said Lunsford executed to said mortgage company a note for $120 payable in semiannual installments of $12 each, one installment falling due on same day as the interest coupons on the $1,200 note matured. That this $120 note was secured by a deed of trust recorded in book

16, at page 122, which is second and subject to the mortgage on page 119.

"3d.   That afterward said Lunsford sold his equity in the land to J. N. Sperry & Company, a real estate firm who had negotiated the loan to Lunsford and who at the time of making said loan were the local correspondents of said mortgage company.   That at the request of Sperry & Company, Lunsford made his deed direct to one Albert Ray.   That Sperry & Company agreed with Lunsford to pay off the $120 note and hold him harmless.

"4th.   W. H. Smith was a member of the firm of J. N. Sperry & Company on June 8, 1889, at the time he bought the land in controversy at foreclosure sale.

"5th.   That about the —— day of ——, 1889, the fourth and fifth coupons on said $1,200 bond and the fourth and fifth installments of said $120 note being due and unpaid, the said Equitable Mortgage Company sent to the sheriff of Polk county, Samuel Hadlock, a notice of sale to be published in a newspaper, and at the same time a deed filled out except the names of the purchasers and the amount of the bid and power of attorney authorizing the sheriff to make the sale.   That said sheriff published said notice in the paper and on the eighth day of June, 1889, sold the land.   That said advertisement and deed both recited the mortgage recorded in book 16, page 119, and contained no reference to book 16, page 122.

"6th.   That said mortgage company intended to foreclose the second mortgage recorded in book 16, page 122, and discovered the error before the sale, but directed the sheriff to proceed with the sale under the advertisement.   That the letter of the mortgage company to the sheriff after it discovered its mistake has been destroyed and the evidence does not show its exact contents.   That at said sale the sheriff announced that the

land would be sold subject to a prior mortgage of $1,-200, and that he was selling under the second mortgage. W. H. Smith became the purchaser and received the deed from the sheriff, offered in evidence, and which had been prepared by the mortgage company.

"7th. That Smith knew that the mortgage company intended to foreclose the second mortgage.

"8th. That W. H. Smith leased the land to defendant Moffitt, and put him in possession as his tenant.

"9th. That the deed of Smith to Wolf was without substantial consideration, and the deed of trust by Wolf to Spoon, trustee, was without consideration. That McQuarry bought the land of Smith with knowledge of all that Smith knew, and on foreclosure of the Wolf mortgage bought the land and took the deed to himself.

"10th. There is no evidence to show that W. H. Smith was a member of the firm of Sperry & Company at the time Lunsford made the deed to Ray, or that he was liable for any obligations of the firm to Lunsford on that account.

"11th. That defendant Chas. B. Wilkinson holds whatever interest he has in the lands for the benefit of the mortgage company.

"12th. That at the sale on the sixth day of January, 1890, Wilkinson bought the lands as agent for the mortgage company, afterward leased it to defendant Moffitt.

"13th. That shortly before W. B. Freeman purchased the land he went with McQuarry to look at it, saw and talked with Moffitt, who led Freeman to believe that he was holding as McQuarry's tenant, and offered to lease the land from Freeman for another year, provided he traded with McQuarry, and wholly

failed to notify Freeman that he was holding the land as the tenant of Wilkinson.

"14th. That after Freeman had seen the land and talked with Moffitt and McQuarry, went to Huntsville, Missouri, and McQuarry saw the live stock and the trade was consummated. That in making said trade and in examination of the title to the land, Freeman used the care and prudence usually exercised by men of ordinary prudence under like circumstances. That Freeman was an innocent purchaser for value and is not chargeable with any of the fraudulent devices of Sperry, Smith, or McQuarry.

"15th. That in preparing and sending to the sheriff the advertisement and deed reciting the mortgage on page 119, and after learning of their error, directing the sheriff to sell under the advertisement, the mortgage company was guilty of gross negligence, which was the primary cause of the record title to the land getting in such a condition to make it easy for sharpers to impose upon an innocent man, and is now estopped from denying that the first mortgage was foreclosed at the sale under which Smith bought, hence judgment for the plaintiff."

Whereupon the court, at the request of the plaintiff, gave the following declarations of law:

"The court declares the law to be, that if W. B. Freeman purchased the land in good faith from McQuarry, without any knowledge of the fraudulent acts of Sperry & Company, Smith, Wolf or McQuarry and paid a valuable consideration for the land and in making such purchase exercised care and prudence as men of ordinary prudence and foresight exercise in like affairs and under like circumstances, and that he had no knowledge that Wilkinson had bought the land, or that there had been a second foreclosure of the deed of trust to the Equitable Mortgage Company,

and that Wilkinson is really holding the title, if any he acquired for the mortgage company, and that said W. B. Freeman visited the land before he purchased and saw defendant Moffitt and talked with him, and that Moffitt proposed to rent the land of Freeman, provided he bought it, and by his acts and conduct led Freeman to believe that he was holding as McQuarry's tenant; and that by the negligence and carelessness of the mortgage company, the record of title to said land became and was in such a condition as to make it easy for Sperry & Company, Smith, Wolf and McQuarry to practice their fraudulent schemes upon a man of ordinary prudence and to make an apparent legal title in McQuarry, then in that event the mortgage company must bear the loss, and the issue should be found for plaintiff."

At the request of the defendants, the court gave the following declaration of law.

"6. In order for the plaintiff to recover in this cause he must show that his title is paramount to the title of the purchaser at the foreclosure sale on January 6, 1890, and unless he has so shown, the judgment must be for the defendant."

Defendants further prayed the court to declare the law as follows:

"1. The court declares the law to be, that a party will be charged with notice of every fact lying within his chain of title and disclosed by the record. And in this case if there was enough disclosed by the record in the chain of plaintiff's title to have put a reasonably cautious and prudent man upon his inquiry as to whether there was not an adverse title to the one under which he claims the property in controversy; in that event he can not be an innocent purchaser for value and the judgment must be for the defendants.

"2.   The court declares the law to be, that if the court sitting as a jury finds from the evidence in this case that there were two deeds of trust executed by Reuben Lunsford and wife, and to the same parties as trustee and beneficiary respectively conveying the same land, executed the same day, and recorded same day, in said book; and that one deed of trust was to secure a principal note of $1,200 and the other to secure ten installment notes of $12 each, and further finds that the notice of sale under which plaintiff's grantors purchased said property, disclosed the fact that said land was being sold in default in the payment of the fourth and fifth installment notes, in the said deed described, and that said notice was attached to and recorded with the trustee's deed under which plaintiff claims title, then in that event, it became the duty of plaintiff to investigate the records and see whether or not there was not another deed of trust between the same parties securing certain installment notes, and if the court sitting as a jury further believe from the evidence that plaintiff could, by an examination of the records, ascertain that fact to be true, but did not do so, he can not be an innocent purchaser for value, and in this case the judgment must be for the defendants.

"3.   That under the pleadings and evidence in this case judgment must be for the defendants.

"4.   The court declares the law to be, that if the court sitting as a jury, finds from the evidence that there was enough in plaintiff's chain of title which if followed up by him would have informed him of defendant's title, and he did not avail himself of the opportunity to investigate the condition of his title from the proper records; then in that event, plaintiff can not recover in this case and judgment must be for defendants.

"5.   After the foreclosure sale of the land in controversy under the first deed of trust, on January 6, 1890, the defendant had a right to attorn to the purchaser at that sale."

I.   On the former appeal it was ruled that the findings of facts by the court made and stated by it in writing had the effect of a special verdict and if there was substantial evidence to sustain the same they would not be disturbed by this court.   To that ruling we still adhere.   *Freeman v. Moffitt*, 119 Mo. 280, and cases there cited.

No exceptions to evidence have been saved or assigned as error.   No objections were made or exceptions saved to the giving or refusing of instructions by the court.   No exceptions were taken or saved to the conclusions of fact reached by the court.

This case originated in the negligence of the attorney of the Equitable Mortgage Company in preparing the notice of sale and the deed to be executed by the sheriff who sold the land in controversy.   That company is now here by its representative Wilkinson seeking to be relieved of the consequences of its own negligence.   Not only did its attorney prepare the notices and deed for the foreclosure of its principal debt of $1,200 and interest when it intended to foreclose a second mortgage for only $120 but his attention was called to this fact before the sale occurred and instead of recalling that notice and blank deed he contented himself with simply writing to the sheriff and requesting him to announce to the bidders that he was selling under a second mortgage under which he had given no notice and to which the notice given would not apply.   In this manner it placed it in the power of Smith and his *confreres* in fraud to successfully concoct a scheme whereby they could delude a purchaser ignorant of the facts.

The trustee's deed recited it was in foreclosure of the mortgage recorded in book 16, page 119. To that deed was attached the advertisement which confirmed that recital. This deed was at once put to record and the sham proceedings begun which resulted in the deed to McQuarry. Smith, by a formal lease, rented the land to Moffitt and placed him in possession. McQuarry upon obtaining his deed had Moffitt to attorn to him. Thereupon they opened correspondence with W. B. Freeman, who lives at Huntsville, Missouri, looking to a trade. Freeman went to Polk county to investigate. He testifies, and the court finds, that McQuarry took him out and showed him the land. That Moffitt and McQuarry led him to believe that Moffitt was McQuarry's tenant and did not disclose that Wilkinson or the mortgage company had any claim whatever. That thereupon McQuarry desiring to see the stock which Freeman offered to trade for the land returned with Freeman to Huntsville. Satisfying himself on this point, McQuarry then produced his abstract of title and Freeman employed an old and reputable attorney to examine it. That attorney pronounced it a perfect title in McQuarry and thereupon McQuarry delivered his deed to Freeman for this land and Freeman turned over the stock.

On the former hearing the fact of Moffitt's possession was held to be such notice as required Freeman to inquire into the state of the title. It now appears that Moffitt and McQuarry led Freeman to believe that Moffitt was McQuarry's tenant and that Moffitt desired to lease of Freeman for another year provided he bought of McQuarry and at no time intimated to Freeman that he held under Wilkinson. This finding, we think, makes a showing of diligence on the part of Freeman commensurate with that of a reasonably prudent man.

VOL. 135 mo—19

The abstract of McQuarry on its face showed a perfect legal title in him and when in addition to this he takes the purchaser upon the land and the tenant in possession recognizes him as his landlord and dickers for a further tenancy of the intended purchaser it is hard to say wherein he is blamable in the absence of notice of the fraudulent conspiracy of Smith and others. And when it is considered that all of these fraudulent pretenses were made possible by the acts of the mortgage company itself, it seems to us there was ample evidence upon which the learned judge could base his findings.

We think the declaration of law given for plaintiff was correct.

The learned counsel for defendant argues at length upon the recitals in the second mortgage. That mortgage is not in evidence and we can not look to it. Besides it is now made apparent that there were interest notes or coupons, exactly suiting the defaulted installments in the first mortgage and had the plaintiff gone to the deed of trust on page 119 of book 16, he would have ascertained that there were interest notes falling due just as recited in the notice.

We remain of the same opinion that we formed on the former investigation of this case as to the fraudulent conduct of Sperry & Company, Wolf, Smith, and McQuarry, but, as we then said, if Freeman was an innocent purchaser he is not to be affected by their misdoings. The learned circuit judge with the witnesses before him and an opportunity to observe them and upon an investigation of his conduct in and about the purchase of the land has found him to be an innocent purchaser.

As the mortgage company by its gross negligence lent aid and assistance to the conspirators and enabled them the better to accomplish their purposes, it is in a

poor position to complain that Freeman was misled into the purchase.

We can find no error in the record and the judgment is affirmed.  BURGESS and SHERWOOD, JJ., concur.